FILED

06/26/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2019 Session

### STATE OF TENNESSEE v. DAVERSEA A. FITTS

**Appeal from the Criminal Court for Sumner County**
**No. 219-2015      Dee David Gay, Judge**

_____

### No. M2018-00750-CCA-R3-CD

_____

A Sumner County jury convicted the Defendant, Daversea A. Fitts, of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. On appeal, the Defendant challenges the sufficiency of the evidence, asserting that the State failed to sufficiently corroborate accomplice testimony presented at trial. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Daversea A. Fitts.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and C. Ronald Blanton and Eric S. Mauldin, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from the shooting death of D'Anthony Hall ("the victim"), in a rural area of Sumner County on December 2, 2014. The investigation into the homicide revealed four individuals involved in the commission of the homicide: Tracy Clark, Doyle Cammon, Johnny Austin, and the Defendant. For his role in the offense, a Sumner County grand jury indicted the Defendant for first degree premeditated murder of the victim.

At trial the parties presented the following evidence: William Holls, a Metropolitan Nashville Police Department officer, testified about an interaction he had with the victim on November 21, 2014, approximately a week and a half before the victim's death. Officer Holls was in the vicinity of the Andrew Jackson Housing Development in Nashville, Tennessee, when he responded to a "'shots fired' call." When he arrived, he came into contact with the victim, who Officer Holls described as "very excited, very worked up," "nervous, anxious," and "very animated with his body language." The victim cooperated with Officer Holls' investigation of the shooting, and Officer Holls obtained arrest warrants.[1] Officer Holls testified on cross-examination that the Defendant was not charged in this shooting incident or listed as a potential witness.

A couple of weeks later, on December 2, 2014, Jeff Cooper, who lived with his uncle, Dicky Alexander, at the corner of Mutton Hollow Road and Rock Springs Road, a rural area of Sumner County, returned home at around 10:00 pm. After parking his car, he heard four to six gunshots nearby. The gunshots were so loud and close in proximity that Mr. Cooper believed the gunshots were coming from either inside the house or on the other side of the house. He heard his uncle yell, so he went inside the house to find him. When he did not find him inside, he called his uncle, who was backing out of the driveway to go check on their horses because he believed someone was shooting at them. The two men remained on the phone talking, until Mr. Alexander said to Mr. Cooper, "hang up and call 9-1-1 there is somebody laying [sic] in the road dead."

Mr. Cooper testified that he could see his uncle driving from where he stood outside the house and noticed his uncle swerving to miss something in the road before instructing him to call 911. As Mr. Cooper spoke with the 911 operator, he drove his truck to the area where he had seen his uncle swerve and found a person lying on the road. Mr. Cooper said that his uncle had continued driving to try and see "where the vehicle went." He stated that neither he nor Mr. Alexander moved or touched the body, but, based upon Mr. Cooper's observations, he believed the person was dead. Mr. Cooper said it was "pretty dark" because there were no lights in that area. After his uncle returned, the two men positioned their vehicles to block the roadway and used their headlights to provide light for the authorities when they arrived.

Shawn Lester, a Sumner County Sheriff's Office deputy, testified that on December 2, 2014, at 10:13 p.m., he was dispatched to the area of Rock Springs Road and Mutton Hollow Road in Sumner County in reference to a call about "shots fired." At the scene, two trucks with their headlights on illuminated the area where a body was lying in the roadway. The body was later identified as the victim.

---

[1] Officer Holls testified that the warrants related to the November 21, 2014 shooting incident were ultimately dismissed for failure to prosecute because the victim was deceased.

Tracy Clark, a co-defendant, testified that he attended high school with the victim and both men were members of the "Gangster Disciples." Mr. Lester recalled that he became involved with the Gangster Disciples through co-defendant Doyle Cammon. Mr. Lester testified that he served as the assistant secretary for the Gangster Disciples in North Nashville for a period of time. His role as assistant secretary required him to "keep up with the roster and everything and pass paperwork along or reports to anybody." Ultimately, however, Mr. Lester "stepped down" from this position due to "disorganiz[ation]" and "a few family issues." As a result, Mr. Lester gave co-defendant Johnny Austin all of the paperwork he had been maintaining as assistant secretary. According to Mr. Lester, Mr. Austin was the chief of security ("COS") for the Gangster Disciples in North Nashville.

Mr. Clark testified that in late November 2014, the Gangster Disciples had an "organizational celebration" for their chairman, Larry Hoover. The celebration was for Mr. Hoover's birthday and held in Memphis, Tennessee. Mr. Clark did not attend the celebration in Memphis but drove Mr. Cammon and Mr. Austin to the "meeting spot" where members were assembling to drive to Memphis together. It was at this time that he first met the Defendant. Due to his absence from the celebration, Mr. Clark anticipated receiving "a fine" but believed that he was not "in trouble" with the Gangster Disciples. Mr. Clark distinguished a "fine" from a "violation," explaining that a violation generally occurred if a member was repeatedly late to a meeting or "disrespect[ed] another brother or brother's family members." If a member committed a violation, "[e]verybody in that area would come together and discuss it" to determine a punishment. He explained that a punishment might be "six straight licks to the chest" or a designated period of time where the member would be unable to fight back or protect themselves during a "beating."

Mr. Clark testified that, after the members returned from Memphis, on November 30, 2014, Mr. Cammon called Mr. Clark and told him to "meet up with everybody" at Mr. Austin's residence on Scovel Avenue[2] ("Scovel Avenue"). At the meeting, the group addressed Mr. Clark's fine for not attending the event in Memphis. The group assessed a fine of seventy-four dollars for Mr. Clark's infraction. He explained that the amount of the fine was determined by "numbers." The letter "G" in Gangster is the seventh letter in the alphabet and the "D" from Disciples is the fourth letter of the alphabet, thus the fine amount was seventy-four dollars. After Mr. Clark paid the fine, the group addressed a social media posting made by the victim. A photograph was passed around for the group to view. On the right side of the photograph was a picture of the victim with four pistols,

---

[2] At trial, the testimony regarding the location of Mr. Austin's residence was referred to as "Scovel Avenue" and "Scovel Street." For consistency, we will reference this location as "Scovel Avenue."

two in his hands and two pistols lying on his lap. On the left-side of the photograph was a portion of the November 21, 2014 warrant for aggravated assault. The group members discussed the punishment for the photograph and concluded that the victim should "get a three minute with a no coverup." Mr. Clark said that he "was on the fence about the situation," so he excused himself and went "up front" to check on the victim before the members finished discussing the punishment.

Mr. Clark testified that he could not remember whether the Defendant attended the November 30 meeting but was certain that Mr. Austin, Mr. Cammon, Dewayne Woodson, Lamont Harding, and "Twin" were present. When the group members confronted the victim about his violation, he began explaining that his aunt was "in jeopardy of losing her place to live" due to the November 21 aggravated assault. As the victim began his explanation, Mr. Clark left. At the time he left the meeting, Mr. Clark believed he was receiving a fine, and the victim was going to receive some type of punishment.

Mr. Clark testified that Mr. Cammon called him on December 2, 2014, asking to meet at Scovel Avenue. When he arrived, Mr. Cammon and Mr. Austin were there. Approximately twenty minutes later, the victim arrived. The men talked and "smoked some weed" together while Mr. Cammon, the victim, and Mr. Austin made a plan to "rob somebody." As part of the robbery plan, the men asked Mr. Clark to "drop them off up in Gallatin." Mr. Clark drove his Honda Civic EX Sport Coupe ("Honda"), Mr. Cammon rode in the front passenger seat, and Mr. Austin and the victim rode in the back seat. Mr. Clark described the Honda as having fog lights on the undercarriage, a loud muffler, a sunroof, and a spoiler. As they drove, Mr. Austin, who was intermittently talking on his cell phone, directed Mr. Clark, who was unfamiliar with Gallatin, where to drive.

Mr. Clark testified that they met the Defendant near a Regions Bank in Gallatin. The victim, Mr. Cammon, and Mr. Austin exited the car and spoke with the Defendant about the potential robbery while Mr. Clark remained in the car smoking cigarettes. After the three men returned to Mr. Clark's Honda, they followed the Defendant, who was driving a black SUV, to an apartment complex. At the apartment complex, the victim, Mr. Cammon, and Mr. Austin got into the Defendant's vehicle and drove away while Mr. Clark waited in his car. After the men drove away, Mr. Clark testified that he moved his car several spaces over to a larger parking space. Approximately forty minutes after they left, Mr. Cammon and Mr. Austin returned without the victim. By way of explanation for the victim's absence, Mr. Cammon told Mr. Clark that the victim was going to stay in Gallatin because he was having "a little issue at home." Mr. Clark drove to Nashville where he left Mr. Cammon at "one of his girlfriend's house" and Mr. Austin at a hotel room.

- 4 -

Mr. Clark testified that he learned of the victim's death the following morning when someone asked him about the victim being killed in Gallatin. Unaware of the victim's death, Mr. Clark called Mr. Cammon, but he did not answer the phone. Mr. Clark went to Scovel Avenue and "before everybody showed up," Mr. Austin instructed Mr. Clark "we weren't up there." Based upon statements of this nature from Mr. Austin and Mr. Cammon, Mr. Clark initially told sheriff's deputies that the men had not been in Gallatin on the night of December 2, 2014. Mr. Clark explained that he lied because he was "trying to keep [his] involvement as little as possible."

The State played surveillance video taken from the Defendant's apartment of Mr. Clark's Honda following the Defendant's vehicle on December 2, 2014 at 10:06 p.m. Another segment showed the Defendant's vehicle leaving the apartment complex while Mr. Clark's Honda remained in the parking lot. The footage showed the Honda, with a spoiler, moving to another parking space consistent with Mr. Clark's testimony. At 11:25 p.m., according to the time provided on the surveillance video, the Defendant's vehicle returned to the apartment complex parking lot.

Mr. Clark testified that he did not see Mr. Cammon, Mr. Austin, or the victim with a gun on the night of the homicide. He confirmed that he, Mr. Cammon, and Mr. Austin all had cell phones with them on the night of December 2, 2014.

On cross-examination, Mr. Clark testified that the Defendant's membership in the Gangster Disciples was in Sumner County not North Nashville and that he did not recall the Defendant being at the November 30 meeting at Scovel Avenue. About the photograph of the victim with the four guns, Mr. Clark explained that the problem with the photograph was that "[w]ord went around with us . . . that we're not supposed to post pictures with our firearms or unnecessary money." Clark agreed that while driving to Gallatin on the night of December 2, 2014, Mr. Austin spoke on his cell phone with the Defendant, who provided directions to the location in Gallatin where they met him.

Mark Anderson, a Metropolitan Nashville Police Department officer, testified as an expert witness in the field of "gangs and gang activities." Officer Anderson provided the jury with an overview of the history of the Gangster Disciples as a gang organization. He explained various methods for initiation into the Gangster Disciples and symbols, such as the Star of David, used by the Gangster Disciples. Officer Anderson also noted that the Gangster Disciples used a lot of alphanumerics, such as, "the number 7 for the letter G; the number 4 for the letter D." He noted that it was also common to see the use of acronyms in gangs. Officer Anderson testified that "MAC" which stands for "make a change" is often used before a member's street name (i.e. Mac Jay).

Officer Anderson testified about the structure of the Gangster Disciples. He explained that the lowest level membership was referred to as the OSM or "an outstanding member." These members "do the field work." The next level was the secretary and then the treasurer and the enforcer. The highest ranking member in an area was the chief of security ("COS"). Officer Anderson described the role of the secretary as the person who took roll call at a meeting, collected dues, and reported this information to the treasurer. The treasurer maintained "the books," "the notes," and the "minutes." The enforcer monitored member conduct as it relates to the gang rules and regulations. Finally the COS is "the boss." Officer Anderson testified that there were seven different Gangster Disciples organizations in the Nashville area. Each area had ranking members and then there was a designated COS for Nashville and another higher ranking officer for the 615 area. The hierarchy extended beyond a city or area code and there were ranking officers for the state of Tennessee, titled associate governor and governor.

Officer Anderson testified about discipline within the gang which varied from fines for minor violations to suspension to severe violations resulting in death. The order to kill a gang member for a violation was commonly referred to as "kill on sight" or "KOS." Officer Anderson confirmed that "snitching in the gang world" was a serious offense. Officer Anderson said that punishment was ultimately determined by the COS; however, members voted on recommendations for punishment. He confirmed that "[s]ecrecy" was a primary rule for the Gangster Disciples preventing members from cooperating with or talking to the police.

Officer Anderson confirmed that G-day was a celebration of the birthday of the founder, Mr. Hoover, on November 30. In 2014, the celebration occurred in Memphis, Tennessee on the weekend closest to Mr. Hoover's birthday, the weekend of the 28th and 29th. He stated that a member's absence from G-day was considered a violation and would more than likely be punished with a fine. Officer Anderson testified that he had reviewed the evidence in this case and that, based upon his experience and training, he believed that the murder of the victim was an execution in retaliation for his cooperation with the police following the November 21, 2014 shooting and the Instagram picture he posted related to those events.

On cross-examination, Officer Anderson explained in more detail the basis for his opinion that the victim's death was a gang-related execution. He noted that the victim had committed two violations: (1) reporting the November 21 incident in Nashville to the police and serving as an affiant on the warrant rather than using the proper channels within the Gangster Disciple organization; and (2) violation of the rule against guns at G-Day as depicted in the photograph posted on Instagram. Officer Anderson said that police intelligence indicated that members left G-day early due to the victim's violation

with regard to posting the photograph. Officer Anderson was aware of the November 30, 2014 meeting on Scovel Avenue, and he understood the punishment was to be a three-minute beating and a fine. Police information indicated that, about the victim's violation and recommended punishment, Mr. Cammon had stated "a snitch is a snitch and [the recommended punishment] wasn't good enough."

Johnny Austin, a co-defendant, testified that he was charged with first degree premeditated murder of the victim and confirmed that he had a criminal record that included felony drug-related convictions. Mr. Austin, age thirty-three at the time of trial, stated that he had been a member of the Gangster Disciples, also known by "Growth and Development," since he was twelve years old. Mr. Austin said that he was "beat in" to the gang at age twelve. He explained that initiation by beating meant a potential member fought three to six people for six minutes. At age twenty-five, Mr. Austin was initiated by being "blessed," which did not involve a beating but was a process whereby members "get to know you, [and] give you pieces to learn and stuff."

Mr. Austin testified that on December 2, 2014, he was chief of security for Nashville. Mr. Austin confirmed the organizational structure of the Gangster Disciples consistent with Officer Anderson's testimony. Mr. Austin added that within the 615 region were the cities of Nashville, Clarksville, Gallatin, Lebanon, Dickson, and "other ones" that he could not recall. As COS for the Nashville area, it was Mr. Austin's responsibility to "protect all GDs in Nashville." At that time, Mr. Cammon served as Assistant COS of Nashville. According to Mr. Austin, Mr. Cammon's responsibilities as Assistant COS were to protect Mr. Austin and protect "GD." Mr. Austin confirmed that he knew Mr. Clark as "McIntosh" and knew the victim through Mr. Cammon.

Mr. Austin testified that as COS of Nashville, his superior was the Defendant, who was COS of the 615 region. He stated that the Defendant lived in Gallatin at the time of these events. Mr. Austin confirmed that Gangster Disciples celebrated "G" day in Memphis, Tennessee in 2014. As COS of Nashville, he arranged for hotel rooms in Memphis while the Defendant arranged for transportation for the members from Nashville to Memphis. On the day they were to drive to Memphis for "G" day, Mr. Clark drove Mr. Austin to a Walgreen's on Charlotte Avenue to meet the Defendant and the other members going to "G" day. The Defendant was driving a white van that Mr. Austin rode in to Memphis, where they stayed for two nights before returning to Nashville on Sunday night, November 30, 2014.

Mr. Austin testified that he normally carried a gun; however, on the trip to Memphis, he did not have a gun. Mr. Austin identified the previously introduced photograph of the victim with four pistols. Mr. Austin stated that he recognized the location of the photograph as one of the hotel rooms he had rented for members in

Memphis. Mr. Austin confirmed that the victim was not supposed to have a gun at "G" day nor was he permitted to take photographs because the COS of Tennessee had prohibited guns at the celebration. When Mr. Austin saw the photograph of the victim, he told the victim that he should not have posted the photograph because the posting would "get all of us in trouble."

Mr. Austin testified that, the day after returning to Nashville from Memphis, December 1, 2014, the Defendant "called a security meeting" at Scovel Avenue. The members present at the meeting were the Defendant, the victim, "Mac Mont, DJ," Mr. Cammon, Mr. Clark, "Brad," and "OG." The meeting was run by the Defendant and held in the backyard of the residence while the victim waited on the front porch with "Mont." The Defendant circulated the photograph of the victim and requested recommendations for punishment. Mr. Austin suggested "[t]hree minutes with no cover." The Defendant scoffed at the suggestion and told Mr. Austin to leave. This angered Mr. Austin because the Defendant was ordering him out of his own backyard. He remained in the backyard listening to the others discuss the punishment. Several others agreed with Mr. Austin's recommended punishment, but Mr. Cammon suggested "[e]radication." Mr. Cammon offered to kill the victim, justifying the punishment by saying "A snitch is a snitch." Mr. Austin testified that, after the meeting, the Defendant stated that the punishment imposed would be "three minutes, no cover up."

Mr. Austin testified that on December 2, 2014, he was staying at a hotel on Trinity Lane with his wife. The Defendant called for another meeting at Scovel Avenue. Once there, the Defendant told the others that he "needed four brothers to come to Gallatin to rob this Blood house." The Defendant wanted the victim, Mr. Clark, Mr. Cammon, and Mr. Austin to go to Gallatin for the robbery. The Defendant left Scovel Avenue and the remaining men contacted the victim and notified him of the robbery plan. The victim met Mr. Clark, Mr. Cammon and Mr. Austin at Scovel Avenue, and Mr. Clark drove the men to Gallatin. Mr. Austin recounted that Mr. Clark was in the driver's seat, Mr. Austin was seated in the front passenger seat, and Mr. Cammon and the victim were in the back seat. Mr. Austin said that Mr. Clark used GPS to navigate to Gallatin but that, during the drive, Mr. Austin called the Defendant who told the men which exit to take off the interstate. The Defendant directed the men to a white house located behind a bank where they met with the Defendant. The victim, Mr. Cammon, Mr. Austin and the Defendant discussed the robbery while Mr. Clark remained in the car. The plan was to rob the other gang of potentially a hundred thousand dollars and drugs.

Mr. Austin testified that the Defendant then directed the men to follow him in his black SUV to an apartment complex. Mr. Cammon, Mr. Austin, and the victim got back into Mr. Clark's car and followed the Defendant. At the apartment complex, Mr. Cammon, Mr. Austin, and the victim got into the Defendant's black SUV. The

Defendant told the victim to sit in the front passenger seat, Mr. Austin to sit in the back seat behind the victim, and Mr. Cammon to sit in the back seat behind the Defendant who was driving. Mr. Clark remained at the apartment complex in his car.

Mr. Austin testified that the men drove around Gallatin, an area unfamiliar to him, for ten or fifteen minutes before the Defendant stopped at a stop sign and pointed out a house that was the target. It was dark outside, and the Defendant made a left turn at the stop sign and then a U-turn before stopping in the middle of the street. The Defendant told the victim and Mr. Cammon to switch seats. Mr. Cammon and the victim exited the black SUV. The victim walked around to the back of the SUV while Mr. Austin observed Mr. Cammon pull out a gun and cock it. The Defendant stated, "Handle that," and then Mr. Austin heard multiple gunshots and the victim holler, "Oh, oh, oh." Mr. Austin slid down in his seat believing that they were being ambushed by the Bloods. Mr. Cammon reentered the vehicle and sat in the front passenger seat. Mr. Austin inquired about the victim's whereabouts and Mr. Cammon responded, "Back there where a snitch supposed to be at." The Defendant then asked Mr. Cammon to confirm that the victim was dead because, if he were not, Mr. Cammon would be "in some trouble." The Defendant then threatened Mr. Austin that if he said "anything" he would be "where [the victim] was."

Mr. Austin testified that they saw a white car at the stop sign, so they quickly returned to the apartments. When they arrived at the apartments, the Defendant gave the men directions to Nashville before Mr. Cammon and Mr. Austin returned to Mr. Clark's car. As they drove to Nashville, Mr. Austin called his wife and then received a call from the Defendant informing him that the Defendant had changed his cell phone number. Mr. Austin stated that he later did the same at the Defendant's instruction.

When they arrived in Nashville, Mr. Clark drove Mr. Austin to Scovel Avenue to retrieve his gun. Mr. Austin explained that, before going to Gallatin, the Defendant had instructed that they were not to take guns, so Mr. Austin left his gun at Scovel Avenue. Additionally, the Defendant said that only Mr. Austin, to communicate with the Defendant, and Mr. Clark, to use the GPS, could take their cell phones. After retrieving the gun from Scovel Avenue, Mr. Clark drove Mr. Austin to "drop [the gun] off to DJ" and then to the hotel room on Trinity Lane. The next morning "Mont" called Mr. Austin to tell him that "everybody" was playing basketball at Looby Center. Mr. Austin joined the men, and when the victim did not arrive, "Mont" said that the victim had not been answering his phone. Mr. Austin said he remained silent "because [he] didn't want to end up dead." As they played basketball, people continued to try to make contact with the victim. At some point, "DJ" approached the men crying, saying that the victim had been found dead in Gallatin. Mr. Austin again said nothing out of fear the Defendant "was going to get [him]."

- 9 -

Mr. Austin testified that the Defendant began coming to Nashville daily to meet and would threaten the others to ensure their silence. Mr. Austin said that these "security meetings" were held in a building in south Nashville on Eighth Avenue. Mr. Austin identified an attendance sheet for a December 19, 2014 security meeting. The sheet listed numbers: "13, 1, 3, 10, 1, 25." Mr. Austin explained that the numbers represented the letter of the alphabet for the member's first name. For example, "13" was Mr. Austin because "M," the first letter of his nickname "Mac Jay," is the thirteenth letter of the alphabet. The attendance sheet also listed each member's job title in the gang.

Mr. Austin testified that the Gangster Disciples "position" on members that "snitch" is "[e]radication." He acknowledged that his testimony was "snitching" and confirmed that "they" would try to "eradicate" him as well. Mr. Austin denied any prior knowledge that the victim was to be killed on the night of December 2, 2014. He believed that the purpose of their trip to Gallatin was to rob a rival gang. Mr. Austin testified that the gang would "put money" on an inmate's jail account to buy the inmate's silence. He agreed that money had been contributed to his account while incarcerated. He explained his decision to testify was because he did not agree with the Defendant's decision to kill the victim. He testified that he believed a lesser punishment would have sufficed, and he wanted the victim's mother and children to have "closure."

Lisa Byington, a Sumner County Sheriff's Office detective, testified that she was dispatched to Rock Springs Road and Mutton Hollow Road on the night of December 2, 2014, related to the report of shots-fired and a body lying in the roadway. At the scene, officers looked for any identifying information on the body and found none. Additionally, no cell phone was found on the body. Detective Byington identified a photograph of the body and described the victim as having worn a gray hooded sweatshirt with a t-shirt underneath, black and white jogging pants, tennis shoes, and a black mask that covered only a portion of the face, "down around his neck."

Detective Byington testified that she was designated as lead detective on this case, but all detectives in her office worked on the case due to its magnitude. Detective Byington provided the jury with a general overview of the investigation, saying that first they determined the victim's identity, fingerprints were taken during the autopsy and sent to the Tennessee Bureau of Investigation ("TBI"), interviews were conducted with people associated with the victim and leads were developed. Next, phone records were obtained and social media monitored. Based upon information gathered, detectives began interviewing potential subjects to confirm their statements about the events of December 2, 2014. Ultimately, Detective Byington obtained indictments for Mr. Austin, Mr. Cammon, and Mr. Clark in February 2015. The interviews with these men corroborated the cell phone records, and detectives then developed the Defendant as a fourth suspect. He was subsequently indicted for first degree premeditated murder, arrested, and

detectives executed a search warrant on the residence he shared with his girlfriend at the time.

Detective Byington testified that the Defendant was arrested in a vehicle with his girlfriend, Belinda Williams. He was taken into custody, transported to the Sumner County Sheriff's Office, and detectives spoke with Ms. Williams. Ms. Williams confirmed that the Defendant lived with her at 390 Magnolia. When Ms. Williams declined to consent to a search of her residence, detectives obtained and executed a search warrant on the address. Detective Byington testified that a red and black tote bag with wheels, a Dell monitor, three "Night Owl" security cameras, and a "Night Owl" hard drive were seized. Additionally detectives seized a Charter Arms 38 Special revolver with five rounds, Hornady Critical Defense 38 Special caliber ammunition, and a trigger lock.

During the execution of the search warrant at 390 Magnolia, detectives seized a Toshiba laptop computer, a white, Samsung Galaxy-S Smart Phone found on the nightstand in the master bedroom, and a black Samsung Smart Phone with a black phone case located in the bathroom. Additionally, a black Verizon flip phone was recovered from the Defendant following his arrest. The Toshiba laptop computer was located inside a black computer bag along with documents confirming that the Defendant and Ms. Williams were residing at the same location and photographs of the Defendant, his family, and GD-related photographs. Detectives also seized a plaque that read "Outstanding Membership Award, Mac Vossie, 11/30/2013," with a picture and below the picture, the quote, "G, be the reason."

Detective Byington identified a red notebook containing various papers and documents. She confirmed that this evidence included the document that Mr. Austin had previously identified at trial as a sign-in sheet for a regional security meeting and that this document was seized from the Defendant and Ms. Williams' residence. The notebook also contained an office space lease contract for a building on Eighth Avenue South.

The State introduced, through Lieutenant Ricky Troup, a Gallatin Police Department officer, a recording of the Defendant's police interview. The interview had been redacted, pursuant to a court ruling, and the portion presented to the jury was approximately forty-five minutes long. The officer informed the Defendant of the charge against him and then reviewed the *Miranda* rights with him. During the interview, the Defendant adamantly denied any knowledge of or involvement in the victim's death. He further disassociated himself from the Gangster Disciples, acknowledging only that he did "socialize" with people who were affiliated with gangs. When asked what position he held with the Gangster Disciples, the Defendant responded that someone had "given [the detectives] bad information." The Defendant stated that he disassociated himself

from any gang members following an event where he was shot on his front porch. When asked what would one do to receive an "outstanding membership award" for the Gangster Disciples, the Defendant responded by giving an example of helping an elderly person take their groceries inside their home. He said that one would receive an award for doing "what you're supposed to be doing," not for fighting or behavior of that type. He reiterated that he had disassociated himself from anyone gang-related after being shot.

During the interview, the Defendant denied knowing Mr. Clark and Mr. Cammon. He said that Mr. Austin was "supposed to be in jail," but he was unsure of the charges. He denied "putting money" on the jail accounts for any of these men but acknowledged that he put money on the books of "the person" he "talked with" on the phone. The Defendant adamantly and repeatedly denied being "friends" with any of the co-defendants but admitted that he knew the victim.

Chet Mason, a TBI Special Agent in the Technical Services Unit, testified that he made a forensic image of the hard drive of a digital video recorder associated with a security camera system. He reviewed footage on the forensic image from November 28, 2014 through December 9, 2014, one week before and a week after the victim's murder and found relevant footage from the date of the shooting. The surveillance video footage contains information as to the date and time of the recording. Video indicating a recording date of December 2, 2018, at approximately 10:00 o'clock at night, showed the Defendant's black SUV and Mr. Clark's Honda enter a parking lot and park. Moments later, after some exchange of passengers, the Defendant's vehicle drove away and Mr. Clark's vehicle moved from its original parking space to another. Special Agent Mason testified that based upon his examination of the equipment, he determined that, due to the time change, the surveillance video clock was fifty-three minutes faster than the actual time.

Holly Conner, a Regional Organized Crime Information Center criminal analyst, testified that she analyzed cell phones associated with the Defendant, Mr. Cammon, Mr. Clark, and Mr. Austin. Using software, ArcView, designed to map the latitude and longitude of cell site locations accessed by a user's cell phone, Ms. Conner created a map of the Defendant's cell phone use on December 2, 2014, beginning at 9:17 a.m. and continuing through 10:58 p.m. The maps showed the Defendant's presence in Nashville and Gallatin throughout the day and were consistent with the testimony regarding his whereabouts leading up to the murder. Between 10:04 pm and 10:20 p.m. his cell phone received two incoming calls by accessing a cell site located on Mutton Hollow Hill Road.

A map depicting cell site locations accessed by all four defendants from 8:59 p.m. through 11:59 p.m. on the night of December 2, 2014 was also entered into evidence. The map showed that cell sites located in the Gallatin area were accessed by the

Defendant, Mr. Austin, and Mr. Clark around the time of the murder. Mr. Cammon's cell phone accessed a cell site in Nashville between 9:17 p.m. and 9:24 p.m. and then showed no activity until 11:44 p.m. when Mr. Cammon's cell phone accessed a cell site located between Mt. Juliet and Lebanon, Tennessee. During the 9:00 p.m. hour, the Defendant, Mr. Clark, and Mr. Austin's cell phones all accessed the same cell site.

Ms. Conner also generated a frequency report to reflect how many times an identified phone number called another identified phone number. Specifically, Ms. Conner created a report showing the frequency of telephone calls made from the Defendant's cell phone to Mr. Austin's cell phone from November 28, 2014, through December 2, 2014. During this time period, the Defendant's phone contacted Mr. Austin's phone more than two hundred times. Ms. Conner also prepared a frequency report for Mr. Cammon's phone to the Defendant's phone for the same time period. The report showed only one contact at 8:19 p.m. on December 2, 2014. The phone call was ninety seconds in duration.

Erin Carney, a forensic pathologist, testified as an expert witness in the field of forensic pathology. Dr. Carney performed the autopsy of the victim and found seven gunshot wounds. Of the seven gunshot wounds two were fatal: one that entered his back and damaged his heart; and one to the inside of his thigh that injured his right femoral vein. Dr. Carney opined that the cause of the victim's death was multiple gunshot wounds. She confirmed the presence of THC in the victim's blood.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant challenges the sufficiency of the evidence, asserting that the State failed to sufficiently corroborate accomplice testimony presented at trial. The State maintains that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and

circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence

was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The evidence, viewed in the light most favorable to the State, showed that the victim committed two gang violations warranting punishment. The punishment was determined by the group members to be "three minutes, no cover"; however, the Defendant and Mr. Cammon expressed doubt as to the leniency of the punishment. The following day the Defendant called for a meeting at Scovel Avenue and announced his intention to rob a rival gang. He selected the victim, Mr. Clark, Mr. Austin, and Mr. Cammon to assist him. No one was to bring a gun and only Mr. Clark and Mr. Austin were allowed to bring phones to assist in navigation. The men met with the Defendant, at a location designated by him, to plan the robbery and then followed him back to his apartment. Video surveillance showed Mr. Austin, Mr. Cammon, and the victim getting into the Defendant's vehicle while Mr. Clark remained in his car at the Defendant's apartment complex. The Defendant drove Mr. Austin, Mr. Cammon, and the victim to a rural area and after making a turn at a four-way stop, parked the vehicle in the middle of the road and told Mr. Cammon and the victim to exchange seats. As Mr. Cammon exited the vehicle, he pulled out a gun, and the Defendant ordered, "Handle that." Mr. Cammon proceeded to the rear of the vehicle and shot the victim multiple times before reentering the vehicle. The men saw another vehicle at the four-way stop and quickly left the scene, returning to the Defendant's apartment. Therefore, the evidence was sufficient to establish that the Defendant participated in the murder of the victim by coordinating the circumstances and ordering the shooting.

The Defendant does not contest that these crimes were committed, but he argues that the proof of his identity as a participant is insufficient because, he claims, there was no corroboration of Mr. Austin's testimony implicating him in these crimes. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn.2001). The law in Tennessee regarding accomplice testimony has been described as follows:

- 15 -

The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

Mr. Clark and Mr. Austin both testified as accomplices regarding the events leading up to the shooting death of the victim. Mr. Clark testified that he followed the Defendant to his apartment complex, parked his vehicle, and after the other men had left in the Defendant's vehicle, he moved his Honda with a spoiler to another nearby space. Mr. Austin testified consistently with the exception of Mr. Clark's actions with regard to moving the car following his departure with the Defendant. Footage recovered from the Defendant's surveillance camera corroborated Mr. Clark and Mr. Austin's testimony about the events that occurred in the parking lot of the Defendant's apartment complex, placing the Defendant with the men and in the area at the time of the murders.

Mr. Clark and Mr. Austin both testified about gang organization, events, and rules. This testimony was corroborated by Officer Anderson, a gang specialist, who testified consistently with the two men about the organization, "G-day" and where and when it was held in 2014, and punishment within the organization. The medical examiner's testimony that the victim sustained multiple gunshot wounds also corroborated Mr. Austin's testimony that he heard multiple gunshots.

Phone calls were exchanged between the participants both before and after the murders occurred. Phone calls received and made from the Defendant's cellular phone indicated that these calls were connected through the nearest cell phone tower, which was located on Mutton Hollow Road, Tennessee, in the area where the victim's body was found. This further corroborates the Defendant's presence in the area at the time of the murders. Mr. Austin's testimony regarding phone calls between him and the Defendant after the murders was also corroborated by the cell phone records.

- 16 -

A lease document for a property on Eighth Avenue and a sign-in sheet for a gang meeting held at the Eighth Avenue property found in the Defendant's residence during the execution of the search warrant corroborate Mr. Austin's testimony about "security meetings" held at a rented location on Eighth Avenue following the victim's shooting. These items also corroborate Mr. Austin's testimony that the Defendant was a ranking member of the Gangster Disciples.

Based upon this evidence, we conclude that a rational jury could find the Defendant guilty beyond a reasonable doubt as to first degree felony murder. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authority, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE